PEOPLE v HORN

OPINION OF THE COURT

1. HOMICIDE—FIRST-DEGREE MURDER—PREMEDITATION—INFERENCES.

Premeditation can be inferred from the circumstances surrounding a killing.

2. HOMICIDE—FIRST-DEGREE MURDER—EVIDENCE.

Evidence was sufficient to support a conviction of first-degree murder where defendant was observed successively beating the victim with a lead pipe, stabbing him with a screwdriver, breaking a chair over him, then continuing to beat him with a part of the chair, dragging him from the apartment, and then was seen in the furnace room with half a human body sticking out of the furnace.

3. HOMICIDE—FIRST-DEGREE MURDER—EVIDENCE—INFERENCES.

A trial judge's finding, as the finder of fact, that defendant was guilty of first-degree rather than second-degree murder was based upon reasonable inferences where the evidence showed that defendant attacked the victim with a variety of weapons, that on at least two occasions defendant was cool enough to hand over his weapons to an eyewitness who had requested defendant to stop, before continuing his attack on the victim, that defendant at the time was not so impassioned he could not

REFERENCES FOR POINTS IN HEADNOTES

[1] 40 Am Jur 2d, Homicide § 264.

Homicide; presumption of deliberation or premediatation from the fact of killing, 86 ALR2d 656.

[2, 3] 40 Am Jur 2d, Homicide § 44 et seq.

[4] 40 Am Jur 2d, Homicide § 45.

[5] 40 Am Jur 2d, Homicide § 261.

[6] 21 Am Jur 2d, Criminal Law § 107.

40 Am Jur 2d, Homicide §§ 128, 129, 295.

Voluntary intoxication as defense to homicide, 79 ALR 897.

Modern status of the rules as to voluntary intoxication as defense to criminal charge, 8 ALR3d 1236.

[7] 40 Am Jur 2d, Homicide §§ 71, 72, 442.

[8] 40 Am Jur 2d, Homicide § 107.

think of a method to kill the victim and dispose of his remains, and that the victim was still alive when he was shoved into the furnace.

DISSENT BY LEVIN, P. J.

4. HOMICIDE—FIRST-DEGREE MURDER—PREMEDITATION.

*Premeditation and deliberation are essential elements of first-degree murder; proof of intent to kill is not enough to establish those elements no matter how brutal and unjustified the killing.*

5. HOMICIDE—FIRST-DEGREE MURDER—PREMEDITATION—DISPOSITION OF VICTIM.

*Evidence of defendant's efforts to dispose of his victim's body is irrelevant in determining whether defendant in a cool state of mind deliberated, premeditated and then decided to kill his victim.*

6. HOMICIDE—FIRST-DEGREE MURDER—EVIDENCE.

*Evidence was insufficient to support defendant's conviction of first-degree murder where the victim died as a result of a vicious and frenzied beating by defendant who not only had been drinking all the preceding day but also with his victim only an hour or so before the affray, where no animosity prior to the beating was shown to have existed between the two men, and where defendant repeatedly muttered during the beating concerning the victim's aspersions about the character of the defendant's girlfriend.*

7. HOMICIDE—FELONY-MURDER—EVIDENCE.

*No evidence existed for the trial judge's finding that defendant killed his victim in order to steal the victim's ring and a chain necklace with a key on it, valued at less than 25 cents, which defendant tore from the victim's body during the course of a beating and threw behind a TV set.*

8. CRIMINAL LAW—HOMICIDE—ARREST—PROBABLE CAUSE.

*Probable cause existed to arrest defendant for homicide where a third person informed police that he had seen defendant in the furnace room of his apartment building, that there was half a human body sticking out of the furnace, and where the police, having made a proper entry of defendant's apartment, discovered blood in plain sight.*

Appeal from Recorder's Court of Detroit, Robert

J. Colombo, J. Submitted Division 1 October 14, 1971, at Detroit. (Docket No. 10293.) Decided July 24, 1972. Leave to appeal denied, 388 Mich 793.

Frank R. Horn was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Michael R. Mueller,* Assistant Prosecuting Attorney, for the people.

*Kenneth A. Webb,* for defendant on appeal.

Before: LEVIN, P. J., and R. B. BURNS and J. H. GILLIS, JJ.

R. B. BURNS, J. The defendant was convicted by a judge sitting without a jury of first-degree murder. MCLA 750.316; MSA 28.548.

The only argument of significance in this appeal concerns the defendant's assertion that since evidence on the element of "premeditation" was totally lacking, first-degree murder could not be proven. Premeditation can be inferred from the circumstances surrounding a killing. *People v Wolf,* 95 Mich 625 (1893); *People v Griner,* 30 Mich App 612 (1971); *People v Morrin,* 31 Mich App 301 (1971). A review of the evidence discloses its sufficiency to support the first-degree murder conviction.

Joyce Montgomery observed the defendant beating the victim, Tingle, with a pipe across his back and buttocks as Tingle lay face down on the floor. Upon her request defendant surrendered the pipe. Joyce hid the pipe in the bathroom and when she returned she observed the defendant stabbing Tin-

gle with a screwdriver. She told defendant that
there was no point in killing Tingle and requested
that he surrender the screwdriver. He gave Joyce
the screwdriver and she took it into the bedroom.
When she returned from the bedroom defendant
was striking Tingle with a chair.

Shirley Perryman testified that before Horn
struck Tingle with the chair, Tingle escaped mo-
mentarily and ran to the door. Defendant caught
him and brought him back into the apartment. He
then struck Tingle with the chair. The chair broke
from the force of the impact and defendant contin-
ued to beat Tingle with part of the chair. Tingle
was moaning.

Joyce then observed defendant with a knife in
his hand. She grabbed his wrist and he gave her
the knife.

The defendant then dragged Tingle from the
apartment and was gone five to ten minutes.

A short time later Fuzzell Perryman observed
defendant in the furnace room and half a human
body sticking out of the furnace. When the police
arrived, they found human remains in the ashes.

The defendant was not so impassioned that he
could not think of a method to kill the victim and
dispose of his remains at the same time. Sufficient
evidence exists to support the inference that the
victim was still alive when he was shoved into a
furnace. The attacks on the victim were made
with a variety of weapons. On at least two sepa-
rate occasions, the defendant was "cool" enough to
politely hand over his weapons before continuing
his attack.

It is not this Court's function to replace the trier
of fact's opinion with its own. Where the factfin-
der's opinion stems from "reasonable" inferences,

then we must affirm. *People v Moore,* 306 Mich 29
(1943); *People v Mosden,* 381 Mich 506 (1969).

The evidence in this case is sufficient to render
the inference of premeditation a reasonable one.

Affirmed.

J. H. GILLIS, J., concurred.


LEVIN, P. J. *(dissenting).* I agree with my col-
leagues that the proofs of premeditation and delib-
eration need not be direct; these subjective factors
may be established by inference from the evidence,
direct and circumstantial. I also agree that our
reviewing function is limited when the finding of
guilt stems from a *reasonable* inference.

I dissent because in my opinion it is not reasona-
ble to infer from the record evidence that the
defendant, Frank Roosevelt Horn, coolly evaluated
the choice that confronted him, and in a reflective
state of mind decided to kill the victim, James
Wesley Tingle.

I conclude that there was insufficient evidence of
premeditation and deliberation. I would amend the
judgment of conviction to reduce the degree of the
offense of which the defendant was convicted from
first-degree to second-degree murder, and remand
for resentencing.

During the morning of the day preceding the
killing, Horn began drinking alcoholic beverages.
At 7 o'clock that evening, Tingle and three other
men gathered at Horn's apartment and consumed
a fifth of whiskey. The gathering was friendly. The
men left at about 10 o'clock. Shortly thereafter,
Horn, who was the manager of the apartment
building in which he lived, received a complaint
from another tenant about a man lying in front of
her door. In response to this complaint, Horn
dragged the man, who was the victim Tingle, from

the hall into his apartment. Tingle and Horn
resumed their drinking.

Joyce Montgomery, who sometimes stayed over-
night in Horn's apartment, observed Tingle and
Horn sitting on the couch in the living room
talking and drinking at 1:30 a.m. Some time be-
tween 1:30 a.m. and 3:30 a.m., Joyce was aroused
from her sleep by her crying baby. She observed
Horn beating Tingle across his back and buttocks
with a pipe as Tingle lay face down on the floor.
There was a gash in Tingle's head. Upon her
request Horn surrendered the pipe. She told Horn
that if he killed Tingle he would go to jail. Joyce
hid the pipe in the bathroom and returned to
observe Horn stabbing Tingle in his left side with
a screw driver. She told Horn there was no point
in killing Tingle and requested that he surrender
the screw driver. He did so and she took it into the
bedroom. When Joyce returned from the bedroom,
she saw Horn striking Tingle with a chair.

Shirley Perryman, who lived in the apartment,
testified that before Horn struck Tingle with the
chair, Tingle escaped momentarily and ran to the
door. Horn caught him and brought him back into
the apartment. It was then that Horn struck him
with the chair. The chair broke from the force of
the impact. Horn proceeded to beat Tingle across
the buttocks with a part of the chair and walked
upon his back and thigh. Tingle was moaning.

Joyce then observed Horn poised with a little
knife in his hand. She grabbed his wrists and he
gave her that knife.

He then started to drag Tingle from the apart-
ment and Joyce removed a larger knife protruding
from Horn's pocket.

During the entire time that Horn was adminis-
tering these various injuries, he kept repeating,

"You don't drag Shirley's name through the mud". "You don't call my Shirley a tramp." "Nobody is going to talk about my Shirley." Shirley Perryman was Horn's girlfriend.

Horn was gone for five or ten minutes after he left the apartment. There is no evidence that an additional beating or wounds were inflicted after Horn dragged Tingle from the apartment.

Five hours later Fuzzell Perryman[1] observed Horn in the furnace room and half a human body sticking out of the furnace. When the police arrived they found evidence of human remains in the ashes. The time and cause of death could not be established.

## I.

There is, of course, ample evidence to convict Horn of murder. Whether he intended to kill Tingle or not, the trier of fact was entirely justified, indeed almost obliged, to infer from the acts committed that Horn intended to kill Tingle. Proof of intent to kill, however, is not enough to establish the added element that distinguishes second-degree from first-degree murder. However brutal and unjustified the killing, it is not murder of the first degree unless the accused person premeditated and deliberated the murder:

"To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. As a number of courts have pointed out, premeditation and deliberation characterize a thought process undisturbed by hot blood. While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long

[1] Fuzzell Perryman is Shirley Perryman's brother and lived in the same apartment building. He returned from work after the beating.

enough to afford a reasonable man time to subject the nature of his response to a 'second look'." *People v Morrin,* 31 Mich App 301, 329–330 (1971).

Similarly, see *Nye v People,* 35 Mich 16 (1876); *People v Banks,* 37 Mich App 280 (1971).

Horn's repetitious mutterings concerning Tingle's aspersions about Shirley, coupled with the fact that Horn had been drinking all the preceding day indicate an excited and beclouded state of mind.

Horn and Tingle had been talking together in a friendly manner only an hour or so before the affray. There is no evidence of any previous animosity between them.

Nor is there any evidence whatsoever that Tingle was—as the majority say—"still alive when he was shoved into a furnace". Fuzzell Perryman observed Horn in the furnace room and the half a human body sticking out of the furnace at 8:45 a.m., about five hours after Horn dragged Tingle from the apartment.

The last injuries appear to have been inflicted with the chair. Shirley Perryman testified that before Horn used the chair Tingle was able to run to the door of the apartment. There is no evidence that a further injury was inflicted after Tingle was removed from the apartment. It, therefore, appears that Tingle's death was the result of the injuries inflicted while he was lying on the floor after the chair fell apart—at a time when Horn was still in an excited state of mind.

The evidence of Horn's efforts to dispose of the body is, of course, irrelevant in determining whether in a cool state of blood he deliberated and premeditated and decided to kill Tingle. *Cf. Austin v United States,* 127 App DC 180, 189–190; 382

F2d 129, 138–139 (1967); *People v Anderson,* 70 Cal
2d 15, 24; 73 Cal Rptr 550, 555; 447 P2d 942, 947
(1968).

The weapons that were used were impromptu
weapons. They were not acquired in a cool state of
blood in preparation for homicide. See *People v
Morrin, supra,* pp 331–332; *Nye v People, supra,* p
17; *Austin v United States, supra,* p 190.

The evidence shows only that Tingle died as a
result of a vicious and frenzied beating. There is
not a scintilla of evidence that would support a
finding that Horn planned in a cool state of blood
to kill Tingle. There is not a scintilla of evidence
that, at some time before the fatal wound was
inflicted, Horn, in a reflective state of mind, pon-
dered the choice that confronted him and decided
to kill Tingle. The testimony showing that Horn
beat Tingle on the back and buttocks is consistent
rather with the view that Horn intended to punish
Tingle—not to kill him. At any time during the
beating Horn could have easily killed Tingle with
the knife Joyce Montgomery removed from one of
his pockets as he was dragging Tingle from the
apartment. Even when Horn held the little knife
in his hand it was poised over Tingle's buttocks
and thighs, not aimed at a vital organ.

The trial judge's statement that, even if there is
insufficient evidence of premeditation and delibera-
tion, Horn is guilty of first-degree murder because
the killing was committed during the course of a
robbery or attempt to rob is manifestly a make-
weight. The evidence relied on to support this
alternative finding is the testimony that during
the course of the beating Horn tore from Tingle's
limp body a ring and a chain necklace with a key
on it. I have examined these pathetic personal
belongings which together would not bring 25¢.
After tearing them from Tingle's body in a fury,

Horn threw them behind a TV set where they were found by the police when they searched Horn's apartment many hours after Tingle's body was cremated. There is no basis for a finding that Horn killed Tingle in order to steal these articles.

## II.

The other assignments of error are without merit. Although no one saw Tingle die and the ashes were not definitely proved to be those of Tingle, the *corpus delicti* was established by evidence and reasonable inferences drawn from such evidence.

There was probable cause to arrest Horn. Fuzzell Perryman informed the police that he had seen Horn in the furnace room and half a human body sticking out of the furnace. When the police arrived at Horn's apartment they made a proper entry and discovered blood in plain view. While there was no timely objection to the subsequent search, nor a motion to suppress, the failure to make a timely objection was not, on the facts of this case, a serious error requiring a new trial. See *People v Degraffenreid,* 19 Mich App 702, 715 (1969).

## III.

As previously observed, the elements of first-degree murder are the elements of the common-law offense of murder with the added statutory element that either the killing was deliberated and premeditated upon or that it was committed in the perpetration of, or the attempt to perpetrate, certain felonies. In finding Horn guilty of first-degree murder, the judge necessarily found that he had committed the common-law offense of murder.

Although the judge was mistaken in concluding that the record permitted him to draw an inference of premeditation and deliberation, the record amply supports the implicit finding that Horn was guilty of common-law (second-degree) murder. Since Horn was convicted of the charged offense, the finding of guilt was not a compromise decision. See *People v Morrin, supra,* p 337.

I would remand for entry of a judgment convicting Horn of second-degree murder and for resentencing on that conviction.