PEOPLE v CLAY

Docket No. 78-7. Submitted June 11, 1979, at Lansing.—Decided August 20, 1979. Leave to appeal applied for.

Vesper Clay was tried on an open murder charge and was convicted of second-degree murder, Washtenaw Circuit Court, Edward D. Deake, J. Defendant appeals, alleging several errors. *Held:*

1. The instructions to the jury on the issue of the defendant's sanity, which included a presumption of sanity, were proper. The instructions also properly instructed the jury on the burden of proof as to sanity, and, when considered as a whole, fairly and accurately presented the issues to the jury.

2. Sufficient evidence was presented at the preliminary examination to warrant the magistrate's binding over the defendant on the open charge of murder.

3. Denial of the defendant's motion to quash the information was proper.

4. Denial of the defendant's motion for a directed verdict on first-degree murder was proper. There was sufficient evidence to permit the trial court to submit the issue of first-degree murder to the jury.

5. A statement made by defendant to the police was voluntar-

REFERENCES FOR POINTS IN HEADNOTES

[1] 30 Am Jur 2d, Evidence §§ 1176, 1177.

75 Am Jur 2d, Trial §§ 738, 739, 742.

Presumption of continuing insanity as applied to accused to criminal case. 27 ALR2d 121.

Modern status of rules as to burden and sufficiency of proof of mental irresponsibility in criminal case. 17 ALR3d 146.

[2] 5 Am Jur 2d, Appeal and Error § 891.

[3] 21 Am Jur 2d, Criminal Law §§ 442, 443.

[4] 21 Am Jur 2d, Criminal Law §§ 449, 450.

40 Am Jur 2d, Homicide § 454.

[5] 75 Am Jur 2d, Trial § 483.

[6] 29 Am Jur 2d, Evidence §§ 611-614.

[7] 29 Am Jur 2d, Evidence §§ 320, 321, 327, 333.

30 Am Jur 2d, Evidence §§ 1161, 1175-1177.

Presumption of continuing insanity as applied to accused in criminal case. 27 ALR2d 121.

ily and understandingly made, and, therefore, was properly admitted into evidence.

6. The testimony of a psychiatrist who had evaluated the defendant on behalf of the people, and a tape recording of an interview with defendant conducted by that psychiatrist, were properly admitted into evidence as rebuttal to the defense of insanity which was presented by the defendant's witnesses, a psychiatrist and a psychologist. References in the taped interview to the defendant's prior criminal activity were admissible, on rebuttal, as bearing on the issue of the defendant's sanity.

Affirmed.

1. CRIMINAL LAW — PRESUMPTION OF SANITY — INSTRUCTIONS TO JURY.

A criminal defendant is presumed to be sane, and a trial court's jury instructions in a case where insanity was claimed as a defense were proper where the instructions included this presumption and explained that the burden of proof was on the people to prove the defendant sane once there was evidence presented tending to show insanity.

2. APPEAL AND ERROR — INSTRUCTIONS TO JURY — FAILURE TO OBJECT — COURT RULES.

Failure to object to a jury instruction precludes appellate review of that instruction (GCR 1963, 516.2).

3. HOMICIDE — MURDER — PRELIMINARY EXAMINATION — DEGREE OF MURDER.

A district judge conducting a preliminary examination of a defendant charged with murder is not required to determine the degree of murder; that determination is for the trier of fact.

4. HOMICIDE — MURDER — PRELIMINARY EXAMINATION.

A magistrate did not abuse his discretion in binding a defendant over to circuit court on an open murder charge where there was evidence presented at the preliminary examination from which it could be inferred that several minutes passed between the defendant's initial attack on the victim and the fatal stabbings, which would be sufficient time for a "second look" and for the elements of premeditation and deliberation to be present.

5. CRIMINAL LAW — MOTION FOR DIRECTED VERDICT.

The prosecution's evidence must be taken as true and viewed in the light most favorable to the prosecution, with the prosecution receiving the benefit of every reasonable inference to be drawn from the evidence, where a defendant has moved for a directed verdict on a charge.

6. APPEAL AND ERROR — CRIMINAL LAW — STATEMENT OF DEFENDANT
— VOLUNTARINESS — ADMISSIBILITY.

A trial court's ruling on the voluntariness and admissibility of a
defendant's statement to the police will not be reversed on
appeal unless the Court of Appeals is convinced that a mistake
has been committed and that the decision of the trial court is
clearly erroneous.

7. CRIMINAL LAW — EVIDENCE — PRIOR CRIMINAL ACTIVITY — INSAN-
ITY.

Testimony regarding prior arrests, convictions, or assaultive and
antisocial conduct, ordinarily completely inadmissible as bear-
ing on the general guilt or innocence of a defendant of the
offense charged, becomes material and admissible as bearing on
the issue of the defendant's sanity where the defense has
presented evidence that the defendant was legally insane at the
time of the charged offense.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *William F. Delhey,*
Prosecuting Attorney, and *James S. Sexsmith,*
Senior Assistant Prosecuting Attorney, for the
people.

*Josephson & Fink,* for defendant.

Before: ALLEN, P.J., and T. M. BURNS and D. E.
HOLBROOK,* JJ.

D. E. HOLBROOK, J. On Thursday, April 21, 1977,
at approximately 6:30 p.m., the defendant-appel-
lant, Vesper Clay, stabbed to death the victim,
Carl Gehringer, in an upstairs bedroom of the
Tessmer Adult Foster Care Home, in the City of
Ypsilanti, Washtenaw County, Michigan.

The defendant was almost immediately arrested
at the scene of the crime. The defendant was
charged with the crime of open murder, MCL

---

* Former Court of Appeals judge, sitting on the Court of Appeals by
assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

750.316; MSA 28.548, on April 22, 1977. The defendant was subsequently arraigned in the 14th District Court for Washtenaw County and preliminary examination was set for and held on April 28, 1977. The defendant was represented by counsel at his preliminary examination and also at his trial. Counsel for defendant urged the magistrate to find a lack of evidence to bind defendant over to circuit court for first-degree murder. The district court ruled that even though the court was not bound to find premeditation, there was sufficient evidence produced at the preliminary examination to show premeditation.

The defendant was bound over to circuit court for trial at the conclusion of the aforementioned preliminary examination. Defendant's arraignment in the Circuit Court for Washtenaw County occurred on May 26, 1977. At arraignment, the defendant stood mute and a plea of not guilty was entered by the court. A pretrial conference was ultimately held on July 14, 1977, at which time a firm trial date of October 17, 1977, was set. The defendant's counsel made several pretrial motions including a motion for a *Walker*[1] hearing, which was granted, and a motion to quash. The *Walker* hearing was held on October 17, 1977, at which time the motion to quash was also heard.

At the conclusion of the *Walker* hearing, the trial court ruled that the defendant's statement, made after having been advised of his rights per *Miranda*,[2] was admissible. It should be noted at this juncture that the district court magistrate had also ruled, at the preliminary examination, that the defendant's statement was admissible.

[1] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966).

Defendant's motion to quash was also denied by the trial court.

At trial, the prosecution produced evidence to show that the defendant and the deceased were residents of the Tessmer Adult Foster Care Home in Ypsilanti, where they shared a room. On April 21, 1977, both the defendant and the victim had dinner at the home, during which time they had a slight argument. After the dinner, the victim went up to his room and the defendant went outside the home for a few minutes. The defendant later went upstairs to the room, whereupon he and the victim continued their argument. The testimony at trial showed that approximately five minutes passed between the first argument at the dinner table and the second argument upstairs in the bedroom. Trial testimony further showed that the resident manager, Gerald Fortier, was called upstairs by another resident, because of a fight between the defendant and the victim. Mr. Fortier, upon going upstairs, found the two men standing about eight to ten feet apart, the victim with an incision in his neck, and the defendant with a knife in his hand. After observing this, Mr. Fortier left the room to call the police. When Mr. Fortier returned, after notifying the police, he found the victim slumped over the bed pleading for help. Mr. Fortier then went downstairs to wait for the ambulance and observed the defendant cleaning off his knife in the crack of the sidewalk.

By the time the police arrived, the victim was dead. Dr. Robert C. Hendrix, an expert pathologist, testified that the victim died from loss of blood from two stab wounds in the chest and lung.

Testimony was introduced by the prosecution to show that Detective William Stenning took a taped statement from the defendant after having

advised him of his *Miranda* rights. The taped statement was played in its entirety for the jury.

After the people had rested, the defendant called Professor Hutt and Doctor Danto, a psychologist and psychiatrist respectively, who testified that at the time of the killing, the defendant was legally insane.

In rebuttal of the defense witnesses, the prosecution called Dr. Charles Hattaway, a psychiatrist from the Center for Forensic Psychiatry, who testified that the defendant was neither mentally ill nor legally insane at the time of the killing. Prior to Doctor Hattaway's testimony, the prosecutor learned that Doctor Hattaway had taped an interview between the defendant and himself. The prosecuting attorney ultimately moved for admission of the tape recording, which was objected to by defendant's trial counsel. However, the defendant's trial counsel's objection was not based on evidentiary grounds but rather on the fact that if the court were to admit the tape recording it should also admit defendant's written reports from Doctor Hutt and Doctor Danto. The tape recording of the interview with Doctor Hattaway was ultimately admitted and played to the jury. Doctor Hattaway stated that he had relied on the information received from the tape recorded interview in forming his opinion as to the defendant's sanity.

The written reports of Doctor Hutt and Doctor Danto were also admitted into evidence at trial. It should be noted at this point that Doctor Hutt's and Doctor Danto's reports contained several references to the defendant's prior incarcerations and prior criminal record.

After both sides had rested, the court then heard final arguments and gave instructions to the jury. Prior to the court's instructions to the jury,

the defendant's counsel objected to the giving of the Michigan Judges Association instructions on insanity, for the reason that a presumption of sanity instruction was included therein.

The jury found the defendant guilty of murder in the second degree. Thereafter, the defendant was sentenced to a term of 20 to 40 years with the Michigan Department of Corrections. Defendant now appeals his conviction and sentence by right.

The defendant claims four errors which we consider in proper order.

I. The trial court's failure to give the Michigan Criminal Jury Instructions on insanity was error. Further, the instructions given from the Michigan Judges Association instructions improperly contained a statement on "presumption of sanity" and failed to state a burden of proof as to mental illness.

We reject the defendant's claims of error. The presumption of sanity has been the law from the very beginning and is still a viable part of our law. *People v Garbutt,* 17 Mich 9 (1868), *People v Eggleston,* 186 Mich 510, 514; 152 NW 944 (1915), and *People v Woody,* 380 Mich 332, 338; 157 NW2d 201 (1968). The trial court properly instructed the jury in accord with the rules laid down in the cases just cited. The proposed Michigan Criminal Jury Instructions (not mandatory at the time of trial of this case) also contain a commentary on the presumption of sanity. 1 MCJI (Ann Arbor, Institute of Continuing Legal Education), p 7-145.

The trial judge instructed on burden of proof as to sanity in the following words:

"Once however there is any evidence tending to show that the defendant was insane, the people then have the burden of proof of establishing beyond a reasonable

doubt that the defendant was legally sane at the time of the alleged offense. In order for you to render a just verdict, it will be necessary for you to consider separately the questions of the presence or absence of mental illness and the presence or absence of legal sanity. In determining whether or not the defendant was mentally ill at the time of the alleged offense, you are to apply the following definitions of mental illness. Mental illness means a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality or the ability to cope with the ordinary demands of life."

The defendant claims that the trial judge should have expanded further on the insanity instructions. The defendant failed to object to this aspect of the instructions so the issue is not preserved for appeal. GCR 1963, 516.2. The instructions, considered as a whole, fairly and accurately presented the issues to the jury.

II. (A) The district court committed error in binding defendant over to circuit court for trial on a charge of open murder, and determining that premeditation was shown on the record.

(B) The trial judge committed error in denying defendant's motion to quash the information, and denying defendant's motion for directed verdict as to first-degree murder.

A. First we point out that the district judge is not, on preliminary examination, required to determine the degree of murder. The degree of murder is for the trier of fact. *People v Strutenski,* 39 Mich App 72; 197 NW2d 296 (1972), and *People v Norwood,* 68 Mich App 730; 243 NW2d 719 (1976).

We also point out that there was some evidence *aliunde* defendant's confession in the examination record that indicated premeditation. The resident manager, Gerald Fortier, went upstairs to the room that Gehringer and defendant shared, and

saw them standing a distance apart, with a cut on Gehringer's neck and with defendant swinging a knife in Gehringer's direction, but not reaching him. He did not describe any other cutting on Gehringer at that time. Both men were standing when Fortier observed them for a short time. Fortier then left the room and went to his apartment next door and called for the police and an ambulance. When he returned to the room, defendant had left and Gehringer, the victim, was partially on the floor and partially on the bed—and he called to Fortier to help him. According to the evidence several minutes elapsed before the fatal stabbings took place. The pathologist, Dr. Hendrix, testified at the preliminary examination in part as follows:

"Q. Would you relate for the Court please, what signs of trauma you found, ah * * * on the body of Mr. Gehringer?

"A. There was a cut on the left ear, was a horizontal cut * * * 'bout mid-point in the ear, it also extended back onto the scalp a little bit behind the ear. Also on the left side of the head on the scalp there was a large cut, it was vertical in position, it was sort of a tangential slice, it was about two and a half (2 1/2) inches in length. There was a cut on the neck on the left side of the neck which extended from the mid-line well around onto the left side. Ahmmm * * * it was about four (4) inches long. It was very shallow; it extended down to the muscle to the neck, but it did not cut any of the major blood vessels of the neck. On the right side of the chest, there were two (2) stabbing or cutting wounds, ahmmm * * * one (1) of them was about eight (8) inches below the shoulder and four (4) inches from the mid-line. This extended, ah * * * it was vertical in position and it was about one and a half (1 1/2) inches long and three-quarters an inch wide. It extended downward through the soft tissues and the * * * third rib was cut. The defect then entered the chest cavity and

penetrated the lung. There was another cutting or stabbing wound on the right side of the chest. This was about ten (10) inches below the shoulder and it was an inch from the mid-line; it measured one and a quarter by three-quarters of an inch. Ah * * * it was in an oblique position pointing upwards and towards the center of the body. This ex—cut went through the fifth rib and entered the chest cavity and penetrated the lung. There was about a quart o' blood free and clotted in the chest cavity. Also on the right side o' the chest right up near the armpit, slightly above the armpit, there were two (2) vertical very shallow scratches; one of these was about two and a half (2 1/2) inches long and the other about one (1) inch. On the left shoulder * * * there was a rather deep cut about three-quarters of an inch long, ah * * * it was way out on the tip o' the shoulder; it extended through the skin into the muscle, no farther. And also on the left upper arm on the lateral side, just above the elbow, there was a two (2) inch, very shallow cut. There were no other injuries.

From the evidence it could be inferred that the fatal stabbings in the chest took place several minutes after the infliction of the neck wound that was shallow and not fatal. This we believe would be a sufficient length of time for defendant to take a 'second look' and satisfy the element of premeditation and for deliberation to be present. *People v Morrin,* 31 Mich App 301; 187 NW2d 434 (1971), and *People v Meier,* 47 Mich App 179, 191-192; 209 NW2d 311 (1973).

We cannot say that the magistrate abused his discretion in binding defendant over to circuit court for trial on the charge of murder. *People v Melvin,* 70 Mich App 138; 245 NW2d 178 (1976).

B. Did the trial court err in denying defendant's motion to quash the information and in denying the defendant's motion for a directed verdict on the charge of first-degree murder?

We have already ruled that there was sufficient

evidence in the preliminary examination testimony to permit the magistrate to bind defendant over on the charge of murder. By the same token it was not error for the trial court to deny defendant's motion to quash the information.

Where defendant at trial claims that the issue of first-degree murder should not have been submitted to the jury, the prosecution's evidence must be taken as true and viewed in the light most favorable to the prosecution with the state receiving the benefit of every reasonable inference to be drawn from the evidence. *People v Watkins,* 36 Mich App 380; 193 NW2d 914 (1971), *aff'd* 388 Mich 717; 202 NW2d 780 (1972).

We find there was more evidence favorable to the state on the issue presented at trial than at the preliminary examination, and that it was sufficient to permit the trial court to submit the issue of first-degree murder to the jury.[3] *People v Charles,* 58 Mich App 371; 227 NW2d 348 (1975), *lv den* 397 Mich 815 (1976), *reconsideration den* 401 Mich 805 (1977), *People v Vail,* 393 Mich 460; 227 NW2d 535 (1975), and *People v Meier, supra,* 191-192.

III. The trial judge erred in determining that defendant's confession was voluntary and admitting the same into evidence.

The defendant made a taped statement to the police on the evening Gehringer was killed. Following a *Walker* hearing the trial court held that the statement was admissible. We review the record to determine the issue. The trial court's ruling will not be reversed unless this Court is convinced

---

[3] The defendant and the victim had an argument at dinner and defendant went outside for about five minutes and then went up to his room where the victim was present and the argument was renewed. The defendant used a knife on the victim and cut his neck before Mr. Fortier entered the room for a few minutes.

that a mistake has been committed and the decision of the trial court is clearly erroneous. *People v Robinson,* 79 Mich App 145, 153; 261 NW2d 544 (1977). Our review of the record convinces us that the required warnings set forth in *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966), were given to the defendant before the statement was taken. The defendant also stated in response to the warnings that he understood them and that he would give a statement.

Dr. Max Hutt, a clinical psychologist, testified that he saw defendant on June 29 and July 15, 1977, and obtained a history of the incident from defendant. Dr. Hutt gave him two series of psychological tests. In the doctor's opinion, defendant was in a confused post-epileptic state at the time he made the statement to the police.

Dr. Hutt felt that defendant's recall in his statement was correct in the sense that he voluntarily offered everything he could but was totally incorrect in terms of accuracy in that he did not recall many of the events.

On cross-examination, Dr. Hutt made the following comments regarding defendant's understanding of his rights:

"Q. Professor Hutt, if Mr. Clay were read, 'You have the right to remain silent,' would he have understood that at the time?

"A. I think he would have understood it. I don't know whether he would have accepted that. I think he had a great need to talk.

"Q. There's no reason, you have no basis for assuming he wouldn't understand the simple statement, 'You have a right to remain silent,' isn't that correct?

"A. No, no, I don't think he would have known what

that meant, what it's implications were, not at that time.

"Q. Well, aren't you changing your testimony? Didn't you just say he would have understood it?

"A. He would have understood the literal aspects of that question, that he had a right to remain silent, but I am saying he would not have understood the implications of that in terms of defense or what he was being charged. I'm saying that that didn't probably enter into his consideration at all."

Detective Stenning testified at the *Walker* hearing and stated that he gave defendant warnings of his *Miranda* rights and that he knew defendant was epileptic and on medication. Stenning testified that defendant moved "like in slow motion", his answers were slow and halting and he rambled some. Stenning testified that defendant was coherent, "pretty" logical and gave a continuous narration. We believe that defendant's memory was somewhat confused as to events but that he voluntarily and understandably made the statement to the police. The trial court's finding was proper and not clearly erroneous. The present case is distinguishable from *People v Stanis,* 41 Mich App 565; 200 NW2d 473 (1972).

IV. It was reversible error to allow the forensic center's psychiatrist to testify as to defendant's statements and admit a taped interview between the forensic center's psychiatrist and the defendant for the purposes of rebuttal of an insanity defense.

Defendant claims the trial court should not have allowed the forensic center's psychiatrist to testify as to defendant's statements made to the psychiatrist at the time of his forensic evaluation. While the plaintiff-appellee agrees with the defendant's quotation of the applicable statute, to-wit: MCL

768.20a(5); MSA 28.1043(1)(5), the plaintiff submits that the statements were clearly admissible because they had a bearing on the issue of the defendant's mental illness or insanity at the time of the alleged offense.

In *People v Woody, supra,* our Supreme Court stated:

"When the defense-called psychiatrist testified that in his opinion the defendant was legally insane, it became the burden of the people to prove his sanity, like every other element of an offense, beyond a reasonable doubt. Testimony of prior arrests, convictions, assaultive and antisocial conduct, ordinarily completely inadmissible as bearing on the general guilt or innocence of the accused of the offense charged, became material and admissible as bearing on the issue of his sanity." 380 Mich 332, 338.

See also *People v Musser,* 53 Mich App 683, 686; 219 NW2d 781 (1974), *People v Culpepper,* 59 Mich App 262, 266; 229 NW2d 407 (1975), and *People v Hammack,* 63 Mich App 87, 93; 234 NW2d 415 (1975). Contrary to the defendant's position, Doctor Hattaway did rely on the information received from the defendant, during his two interviews with Dr. Hattaway, in forming an opinion as to defendant's sanity.

It is true that certain references were made in the taped interview to defendant's prior criminal record and incarceration. The defendant claims that the forensic psychiatrist may testify to facts learned at a compulsory mental examination only for purposes of rebutting an insanity defense. The plaintiff replies that that is exactly the reason that Doctor Hattaway was called to the stand; to rebut the insanity defense put before the jury by defen-

dant's witnesses, Doctor Hutt and Doctor Danto. There was no error here.

The defendant objected at trial to the admission of the taped interview but not for the reason now advanced. Counsel for defendant, during the discussion with the trial court, argued that it would not be fair to permit the taped interview with Doctor Hattaway to be admitted unless the reports of defendant's Doctors Hutt and Danto were likewise admitted. We note that these reports were admitted. We also note that the references on the tape to defendant's prior criminal record and incarceration were likewise contained in Doctor Hutt's and Doctor Danto's reports. These facts were properly used by all of the doctors in evaluating the defendant's sanity.

Affirmed.